IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-75

No. 477A20

Filed 17 June 2022

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION, ATTORNEY
GENERAL JOSHUA H. STEIN, PUBLIC STAFF – NORTH CAROLINA
UTILITIES COMMISSION

v.

VIRGINIA ELECTRIC AND POWER COMPANY d/b/a DOMINION ENERGY
NORTH CAROLINA


Appeal as of right pursuant to N.C.G.S. § 62-90 and N.C.G.S. § 7A-29(b) from

a final order of the North Carolina Utilities Commission entered on 24 February 2020

in Docket No. E-22, Sub 562 and 566. Heard in the Supreme Court on 5 January

2022.

*Public Staff – North Carolina Utilities Commission, by Chief Counsel Diane W.
Downey and Staff Attorneys Lucy E. Edmondson, Nadia L. Luhr, Robert B.
Josey, and Munashe Magarira, for North Carolina Utilities Commission, and
Joshua H. Stein, Attorney General, by Margaret A. Force, Special Deputy
Attorney General, appellees.*

*McGuire Woods, LLP, by Mary Lynne Grigg, Mark E. Anderson, W. Dixon
Snukals, Nicholas A. Dantonio, and Bradley R. Kutrow, for Virginia Electric
and Power Company d/b/a Dominion Energy North Carolina, appellant.*

ERVIN, Justice.

This appeal arises from an order entered by the Commission addressing an

application for a general increase in its North Carolina retail rates filed by Virginia

Electric and Power Company d/b/a Dominion Energy North Carolina.  In its order, the Commission authorized Dominion to calculate its North Carolina retail electric rates by, among other things, amortizing certain costs associated with the storage, disposal, and removal of coal ash waste to rates over a ten-year period while rejecting Dominion's request to be permitted to earn a return on the unamortized balance of those costs.  In seeking relief from the Commission's order before this Court, Dominion argues that the Commission acted arbitrarily and capriciously by failing to utilize the same amortization period that had been employed in two earlier decisions involving Dominion and Duke Energy Corporation addressing the ratemaking implications of coal ash-related costs and by failing to allow Dominion to earn a return on the unamortized balance of those costs as had been permitted in the earlier decisions.  More specifically, Dominion argues that the Commission erred by "fail[ing] to set forth *any* facts to support its break with its own precedent," that "[a]ny differences that exist between [Dominion] and Duke Energy warrant more favorable ratemaking treatment for" Dominion in this case, and that the Commission's failure to follow the precedent that had been established in its earlier coal ash-related decisions violated the equal protection provisions of the United States and North Carolina Constitutions.  After careful consideration of Dominion's challenges to the Commission's order in light of the record and the applicable law, we affirm the Commission's order.

## I. Factual Background

### A. Substantive Facts

The application that Dominion filed with the Commission in this case sought an increase in the company's North Carolina retail rates and charges, with the costs upon which Dominion's application was predicated having included substantial amounts that Dominion had incurred in order to remediate conditions at the company's coal ash storage facilities between 1 July 2016 and 30 June 2019,[1] which included the costs of complying with both federal and state regulatory requirements that mandated the closure of existing coal ash basins and other storage areas. Among other regulations, certain Dominion facilities are subject to the "Hazardous and Solid Waste Management System—Disposal of Coal Combustion Residuals from Electric Utilities" rule, 80 Fed. Reg. 21301, or "CCR Rule," which was promulgated by the Environmental Protection Agency on 17 April 2015. According to the CCR rule, affected utilities are required to retrofit or close all of their existing coal ash ponds and to perform groundwater monitoring, engage in various sorts of corrective action, and take other steps, as necessary, to prevent the harmful substances found in coal combustion residuals from percolating into nearby groundwater. Eight of Dominion's

---

[1] Coal ash, or coal combustion residuals (CCR), is the by-product generated when coal is burned for the purpose of generating electricity. Historically, coal combustion residuals have been stored either in wet pond impoundments or in dry landfills.

coal-fired generating facilities and related coal ash storage facilities are subject to the CCR rule.

¶ 3 Another coal ash-related regulatory requirement that affects Dominion's operations is Virginia Senate Bill 1355, which was adopted in 2019 and requires Dominion to remove coal combustion residuals from the storage ponds used at four of Dominion's coal-fired electric generating facilities and to place them into lined, permitted landfills, with the excavated coal ash waste to be permanently housed either in fully-lined onsite landfills that have been constructed consistently with modern standards or in offsite landfills and with Dominion being required to recycle approximately 25% of excavated coal ash waste in the event that it is economically feasible to do so. In order to satisfy the requirements of the CCR Rule and other applicable state and federal laws, Dominion developed closure plans for each of the ponds and landfills to which these regulations applied. As a result, Dominion incurred a North Carolina retail amount of $21.8 million for the purpose of managing its coal ash waste during the three year period from 1 July 2016 until 30 June 2019, including "(1) $19.2 million in expenditures made . . . to comply with federal and state environmental regulations associated with managing CCRs and converting or closing waste ash management facilities at seven of [Dominion]'s generation stations; and (2) $2.7 million in financing costs."

## B. Prior Commission Decisions Relating to Coal Ash Remediation

¶ 4      On 31 March 2016, Dominion applied to the Commission for a general rate increase for the purpose, in part, of reflecting coal ash-related costs that it had incurred through 30 June 2016 in its North Carolina retail rates and charges. *Application of Va. Elec. & Power Co., d/b/a Dominion N.C. Power, for Adjustment of Rates and Charges Applicable to Elec. Util. Serv. in N.C.*, Docket No. E-22, Sub 532, 2016 N.C. PUC LEXIS 1183, at *4-5 (N.C.U.C. Dec. 22, 2016). Subsequent to the filing of Dominion's application, the Public Staff and Dominion entered into a stipulation that provided, with respect to Dominion's coal ash-related costs, that:

> (1)      Amortization periods — CCR expenditures incurred through June 30, 2016, should be amortized over a five-year period. Notwithstanding this agreement, the Stipulating Parties further agree that the appropriate amortization period for future CCR expenditures shall be determined on a case-by-case basis.
>
> (2)      Deferral of future CCR expenditures — By virtue of the Commission's approval in this proceeding of a mechanism to provide for recovery of CCR expenditures incurred through June 30, 2016, the Company has authority pursuant to the August 6, 2004, Order in Docket No. E-22, Sub 420, to defer additional CCR expenditures, without prejudice to the right of any party to take issue with the amount or the treatment of any deferral of ARO costs in a rate case or other appropriate proceeding.
>
> (3)      Continuing amortization and deferral of CCR expenditures — The Company and the Public Staff reserve their rights in the Company's next general rate case to argue to the Commission (a) how the unamortized balance of deferred CCR expenditures incurred by the Company

prior to June 30, 2016, and the related amortization expense should be addressed; and (b) how reasonable and prudent CCR expenditures incurred by the Company after June 30, 2016, should be recovered in rates.

(4)     Overall prudence of CCR Plan — The Public Staff's agreement in this proceeding to the deferral and amortization of CCR expenditures incurred through June 30, 2016, shall not be construed as a recommendation that the Commission reach any conclusions regarding the prudence and reasonableness of the Company's overall CCR plan, or regarding any specific expenditures other than the ones to be recovered in this case.

*Id.* at \*137-39.   After the conclusion of an evidentiary hearing, the Commission

approved the portion of the parties' stipulation relating to coal ash-related costs,

determining that Dominion was

allowed to defer the costs of its remediation of coal combustion residuals through June 30, 2016, and shall be allowed to amortize those deferred costs over a period of five years.   The Company submitted substantial evidence that its costs incurred to comply with federal and state law regarding disposal of CCRs were prudently and reasonably incurred. . . .   However, the Commission's approval of [Dominion]'s CCR cost deferral is based on the particular facts and circumstances presented in this docket and, therefore, is not precedent for the treatment of CCR costs in any future proceedings.

In addition, the Commission finds and concludes that the treatment of CCR costs incurred by [Dominion] after June 30, 2016, shall be reviewed in a future rate case, subject to the provisions of the Stipulation regarding future amortization periods, deferral of future CCR expenditures, continuing amortization and deferral of CCR expenditures, and any other arguments or positions presented by the Company, the Public Staff, or another party at that time.

> Further, the Commission's determination in this case shall not be construed as determining the prudence and reasonableness of the Company's overall CCR plan, or the prudence and reasonableness of any specific CCR expenditures other than the ones deferred and authorized to be recovered in this case.

*Id*. at *152-53. Based upon these findings, the Commission approved the stipulation between Dominion and the Public Staff "in its entirety," so that Dominion was allowed to amortize the coal ash-related costs that it had incurred prior to 30 June 2016 over a period of five years and to earn a return on the unamortized balance. *Id*. at *374.

¶ 5 On 1 June 2017, Duke Energy Progress filed an application for a general rate increase that included, among other things, a request to account for certain coal ash-related remediation costs in the calculation of its North Carolina retail rates and charges. *State ex rel. Utils. Comm'n v. Stein*, 375 N.C. 870, 880 (2020). Similarly, on 25 August 2017, Duke Energy Carolinas filed an application with the Commission seeking a general rate increase that reflected certain costs relating to the closure of coal ash basins and other coal ash-related compliance costs in the calculation of its North Carolina retail rates and charges. *Id*. at 880–81. The Public Staff, the Attorney General, the Sierra Club, and several other parties intervened in these proceedings for the purpose of arguing that the Commission should not allow Duke to include some or all of these coal ash-related costs in the calculation of its North Carolina retail rates and charges, *id*. at 881, in light of Duke's alleged

mismanagement of its coal ash basins, with the Public Staff having urged the Commission to adopt an "equitable sharing" plan that would have resulted in a 50-50 sharing of these costs between Duke's shareholders and ratepayers. *Application by Duke Energy Progress, LLC, for Adjustment of Rates and Charges Applicable to Elec. Util. Serv. in N.C.; Application by Duke Energy Carolinas, LLC, for Adjustment of Rates and Charges Applicable to Elec. Util. Serv. in N.C.*, 2021 N.C. PUC LEXIS 723, *1 (N.C.U.C. June 25, 2021). After conducting an evidentiary hearing, the Commission entered orders allowing Duke Energy Progress and Duke Energy Carolinas to amortize the coal ash-related costs that they had accumulated between 2015 and 2017 over a five-year period, and to earn a return on the unamortized balance of these costs. *Id*. at *1–2. On the other hand, the Commission imposed a $30 million mismanagement penalty on Duke Energy Progress and a $70 million mismanagement penalty on Duke Energy Carolinas as a result of the manner in which the companies had handled their coal combustion residuals. *Id*. at *2.

¶ 6       After the entry of these orders, the Attorney General, the Public Staff, and the Sierra Club sought relief from the Commission's orders before this Court. *Stein*, 375 N.C. 870. As is discussed in more detail below, this Court determined in *Stein* that the Commission had the authority to allow Duke Energy to amortize coal ash-related costs in its North Carolina retail rates and charges and to allow the recovery of a return on the unamortized balance of those costs pursuant to N.C.G.S. § 62-133(d)

given that the enactment of the CCR Rule and other state laws regulating coal ash storage and disposal had "forced [Duke Energy] to confront an 'extraordinary and unprecedented' issue involving the potential expenditure of billions of dollars in order to address a significant environmental problem." *Id*. at 926. On the other hand, this Court also found that the Commission was "required to consider all material facts of record" in the course of exercising its authority to consider "other facts" pursuant to N.C.G.S. § 62-133(d), that the Commission had failed to consider certain facts "pertaining to alleged environmental violations," and that both cases should be remanded to the Commission for the purpose of reconsidering the Public Staff's "equitable sharing" proposal in light of a correct understanding of the applicable law. *Id*. at 931–33.

¶ 7         After this Court's decision in *Stein*, Duke Energy entered into a settlement agreement with the Public Staff, the Attorney General, and the Sierra Club, 2021 N.C. PUC LEXIS 723, *10, for the purpose of "resolv[ing] not only the 2017 rate cases on remand from the Court but also the 2019 rate cases and future CCR costs to be incurred through" 2030 for both Duke Energy Progress and Duke Energy Carolinas. *Id*. at *27. In this settlement, Duke agreed to a significant reduction in the amount of coal ash-related costs that were to be included in the calculation of the companies' rates, with "the net present value of the savings to [ratepayers] from forgone CCR cost recovery (including applicable financing costs) [having] amount[ed] to more than

$900 million," *id.* at \*29, including a $261,000,000 reduction in the amount of coal ash-related costs included in Duke Energy Progress' North Carolina retail rates, a $224,000,000 reduction in the amount of coal ash-related costs included in Duke Energy Carolina's North Carolina retail rates, "future reduced recovery of CCR costs through . . . 2030 of $162 million [for Duke Energy Progress] and $108 million [for Duke Energy Carolinas], and other additional customer-savings provisions." *Id.* at \*30. On 25 June 2021, the Commission entered an order approving the proposed coal ash cost-related settlement. *Id.* at \*37.

**C. Procedural History of the Current Dominion Rate Case**

On 27 February 2019, Dominion filed a Notice of Intent to File a General Rate Application with the Commission in Docket No. E-22, Sub 562. On 29 March 2019, Dominion filed an application with the Commission for the purpose of seeking a $26,958,000 increase in its North Carolina retail rates and charges. On 17 September 2019, Dominion and the Public Staff entered into a stipulation resolving all of the matters at issue in this case with the exception of "issues associated with coal combustion residuals (CCR) costs." The Commission conducted an evidentiary hearing for the purpose of resolving the issues that remained in dispute between the parties.

In the course of a hearing held before the Commission for the purpose of receiving expert witness testimony on 23 September 2019, Jason E. Williams testified

on behalf of Dominion that the Company had "historically managed CCR consistently with evolving industry standards and regulatory requirements"; that, by 1988, 80% of the coal ash generated at Dominion's coal-fired generating facilities was stored in surface impoundments or landfills; and that the actions that the Company had taken "to comply with the federal and state requirements have been reasonable and prudent." Jay Lucas, on the other hand, testified for the Public Staff for the purpose of describing its "equitable sharing recommendation," pursuant to which Dominion shareholders would be required to cover 40% of the relevant coal ash costs while the remaining 60% would be included in calculating Dominion's North Carolina retail rates.

¶ 10        According to Mr. Lucas, while the Public Staff's equitable sharing plan was not predicated upon the use of a prudence standard, pursuant to which 100% of the company's coal ash-related costs would have been disallowed, at least in his opinion, the agency's proposal made sense in light of the magnitude and nature of Dominion's coal ash remediation costs and the extent of Dominion's culpability for the resulting environmental contamination given the company's "fail[ure] to improve its CCR management practices despite the evolving knowledge of the risk of unlined CCR storage at the time," which indicated that "wet storage of CCR in unlined surface impoundments was detrimental to the quality of surrounding groundwater and surface water." Mr. Lucas described multiple known exceedances of the applicable

groundwater contaminant limits at several of Dominion's coal ash sites, including an exceedance at the company's Possum Point facility in the 1980s; elevated trace metal levels in the groundwater, surface water, and soil surrounding the Chisman Creek facility; and 548 instances of groundwater exceedances which resulted from Dominion's failure to prevent the leaching of coal combustion residuals from its surface impoundments. In addition, Mr. Lucas described six different instances in which environmental groups, local government entities, and property owners had initiated legal proceedings against Dominion as the result of pollution stemming from the leaching of coal ash contaminants, including arsenic, into surface waters from wet impoundments. When asked why the Public Staff's proposed "equitable sharing" plan in this case was more favorable to Dominion than the plan that the Public Staff had proposed in the 2017 Duke Energy rate cases, Mr. Lucas responded that Dominion had "not been found guilty of criminal negligence with respect to its management of waste coal ash facilities" and that there was "less evidence" of harmful environmental impacts than had been the case with respect to Duke Energy's facilities.

¶ 11 In the same vein, Public Staff witness Michael C. Maness defended the Public Staff's "equitable sharing" proposal on the grounds that:

> [t]he total amount of the costs is large (approximately $377 million on a system level and approximately $22 million on a North Carolina retail level), which amounts to approximately $179 per North Carolina retail customer, or $60 per year per North Carolina retail customer, before

> considering the impact of including the unamortized amount in rate base.
>
> [Dominion] will be incurring significant additional costs in the future related to the CCR Excavation Act (Virginia Senate Bill 1355).
>
> The incurrence of these costs will not provide any benefits to customers in terms of additional electric service or improvements to service.
>
> The incurrence of CCR costs has not been the result of economic analysis that pointed toward an action that would be economically advantageous to ratepayers.
>
> . . . [T]he Commission has implemented equitable sharing in several past circumstances involving incurred costs that did not provide any future benefits to retail customers.

According to Mr. Maness, the Public Staff's proposal that ratepayers bear 60% of the costs and that shareholders bear 40% of the costs was appropriate in light of the manner in which Dominion had managed its coal combustion residuals and the nature and magnitude of the resulting costs and that the resulting "equitable sharing" could be achieved by precluding Dominion from earning a return on the unamortized balance of its coal ash-related costs and by amortizing the costs over an eighteen-year period, with it being likely that "the Public Staff would . . . recommend some level of sharing even in the absence of environmental culpability, due to the magnitude and/or nature of the costs."

¶ 12        In rebuttal, Mr. Williams denied that Dominion had failed to properly manage its coal combustion residuals, asserting that "the Public Staff has acknowledged that

it is not capable of or willing to identify a specific action the Company could have taken in the past," that "neither the Company nor the Public Staff could find any example prior to 2016 where the Public Staff had raised any concerns regarding groundwater or surface water issues," and that the Public Staff should refrain from acting as an environmental regulator in the course of judging the prudence of the Company's past actions. Based upon this logic, Mr. Williams concluded that the Public Staff's proposal to disallow admittedly prudent and reasonable costs on the basis of "equitable sharing" was "shortsighted and could lead to an unpredictable and unhealthy regulatory environment for utilities and their customers."

¶ 13        On 24 February 2020, the Commission entered an order in which it found as fact that:

> **Recovery of CCR Costs**
>
> 49.    Since its last rate case, on a North Carolina retail jurisdictional basis, from the period beginning July 1, 2016 and running through June 30, 2019 (the Deferral Period), [Dominion] has incurred $21.8 million in costs associated with the management of CCRs (the CCR Costs). The $21.8 million includes: (1) $19.2 million in expenditures made during the Deferral Period to comply with federal and state environmental regulations associated with managing CCRs and converting or closing waste ash management facilities at seven of [Dominion]'s generation stations; and (2) $2.7 million in financing costs incurred during the Deferral Period.
>
> 50.    The record includes substantial evidence that, particularly where CCRs were being managed in lined

landfills, the CCR Costs incurred during the Deferral Period were prudently incurred.

51. Although the Public Staff offered evidence challenging the manner in which [Dominion] had managed CCRs and its various CCR waste management facilities over several decades, insofar as the specific CCR Costs incurred during the Deferral Period are concerned, while the record contains evidence that identifies instances of imprudence, the record contains insufficient evidence to permit the Commission to quantify the effects of imprudent actions on ratepayers.

52. [Dominion] is entitled to recover the CCR Costs established in this general rate case, in the manner and subject to the conditions as set forth herein.

In addition, the Commission noted that the order that it had entered in connection with the Company's 2016 rate case did "not have precedential value with respect to the CCR issues in this case" because the stipulation between Dominion and the Public Staff that had been approved in that proceeding provided that:

[t]he Public Staff's agreement in this proceeding to the deferral and amortization of CCR expenditures incurred through June 30, 2016, shall not be construed as a recommendation that the Commission reach any conclusions regarding the prudence and reasonableness of the Company's overall CCR plan, or regarding any specific expenditures other than the ones to be recovered in this case.

Moreover, the Commission noted that it had explicitly stated that its order in that proceeding should "not be construed as determining the prudence and reasonableness of [Dominion]'s overall CCR plan, or the prudence and reasonableness of any specific

CCR expenditures other than the ones deferred and authorized to be recovered in this case," *Application of Va. Elec. & Power Co., Ord. Approving Rate Increase and Cost Deferrals and Revising PJM Regul. Conditions*, Docket No. E-22, Sub 532, at \*3 (N.C.U.C. Dec. 22, 2016), and that it would be "inappropriate to give the 2016 [Dominion] Rate Case Order precedential effect" in view of the fact that the evidence that had been presented in that proceeding was "far less extensive" than the evidence that had been presented in this proceeding given that Dominion and the Public Staff had entered into a stipulation in the earlier proceeding, so that the "issues of prudence and reasonableness were not fully litigated and no significant evidentiary record was developed."

¶ 14        According to the Commission, Dominion had made a prima facie showing that the coal ash-related costs that it had incurred between 1 July 2016 and 30 June 2019 had been prudently incurred in light of the fact that the company had largely discontinued wet storage of coal ash and moved towards storing dry ash in lined landfills.  On the other hand, the Commission noted that, even though the Public Staff had not "expressed [an] opinion on the prudence and reasonableness of the [coal ash c]osts," one of its witnesses had "testified to a number of deficiencies in [Dominion]'s historical management of [coal ash] and the resulting environmental impacts," such as late and deficient groundwater monitoring, the decision to ignore a recommendation to construct a dry waste disposal facility at one of the coal ash sites,

and groundwater data showing exceedances of certain elements and heavy metals such as barium, cadmium, copper, iron, manganese, nickel, phenols, potassium, sodium, and zinc at one of the coal ash sites. In addition, the Commission noted the existence of evidence that "call[ed] into question" the prudence of the manner in which Dominion had incurred certain coal ash-related costs, such as the fact that, prior to the adoption of the CCR Rule, Dominion had planned to permanently store some of its coal ash in unlined wet ponds and to cover the ponds with soil, a practice that was likely to cause hydraulic pressure in the ponds and facilitate the continued migration of coal ash-related pollutants into the surrounding groundwater.

In finding that Dominion's coal ash costs had been prudently incurred, the Commission noted that, "while the evidence demonstrates a difference of opinion or dispute as to whether certain [of Dominion]'s actions, omissions or decisions were prudent," neither party had "presented evidence to attempt to quantify which, if any, of the [coal ash c]osts might have been avoided if [Dominion] had used a different approach to managing [coal ash recovery] at some point during the last several decades" and stated that

> it would be very difficult to go back and recreate the timing and cost of such different approaches. For example, one could argue that [Dominion] should have converted all of its coal-fired plants to dry ash handling at least at some time during the 1990s. However, to quantify the costs and benefits of this strategy would require establishing, with some level of certainty, the costs that [Dominion] would have incurred for such conversions, and the savings in

present [coal ash] remediation costs that would have resulted from such conversions. In addition, [Dominion] could have been entitled to recover those conversion costs, plus a return on its increased rate base, from its ratepayers over the past several decades. On the present record, the Commission has no substantial evidence on which to make such determinations. Thus, based on the foregoing, . . . the Commission concludes that the [coal ash c]osts were prudently incurred.

After reaching this conclusion, the Commission determined that it would be "just and reasonable" to deny Dominion a return on the unamortized balance of the coal ash costs that it had incurred between 1 July 2016 and 30 June 2019 and to permit the amortization of those costs over a ten-year period. In support of this result, the Commission concluded that:

**Ratemaking Treatment of Recoverable CCR Costs**

53.     Just and reasonable rates will be achieved by excluding from rate base the CCR Costs and amortizing recovery of the CCR Costs over a period of ten years.

54.     It is reasonable, based on the evidence in the record in this proceeding, for [Dominion] to recover its financing costs on the CCR Costs incurred during the Deferral Period, up to the effective date of rates approved pursuant to this Order, calculated at [Dominion]'s previously authorized weighted average cost of capital.

55.     It is reasonable, based on the evidence in the record in this proceeding for annual compounding to be used in calculating the financing costs of deferred costs, including the CCR Costs, during the Deferral Period.

As further support for this determination, the Commission reasoned that Dominion

should not be allowed to earn a return on the unamortized balance of coal ash costs

in light of:

> (1) the Commission's obligation to set just and reasonable
> rates that are fair to both the utility and the ratepayer in
> accordance with N.C.G.S. § 62-133(a); (2) the Commission's
> historical treatment of extraordinary, large costs, such as
> [Manufactured Gas Plant] environmental remediation
> costs and plant cancellation costs; and (3) the
> Commission's obligation to consider all other material facts
> of record that will enable it to determine what are just and
> reasonable rates in accordance with N.C.G.S. § 62-133(d).

More specifically, the Commission noted that, when Public Service Company of North

Carolina, Inc., had sought recovery of substantial costs incurred for the purpose of

remediating hazardous by-products that were created at manufactured natural gas

plants, it had determined that, while the utility should be authorized to amortize its

prudently incurred remediation costs to rates over a period of years, the company

should not be allowed earn a return on the unamortized balance of those costs on the

grounds that such a result struck the "proper balance between ratepayer and

shareholder interests" and gave the utility "an incentive to minimize clean-up costs

and to pursue contributions from third parties where appropriate." In addition, the

Commission cited to a 1983 order in a proceeding in which Dominion had sought to

include costs associated with the abandonment of certain proposed nuclear

generating facilities in the calculation of its North Carolina retail rates, *Application*

*of Va. Elec. and Power Co. for Auth. to Adjust and Increase Its Elec. Rates and Charges*, No. E-22, Sub 273, 73 N.C.U.C. Orders & Decisions 343, 355 (Dec. 5, 1983), and in which the Commission had concluded that, while the relevant nuclear plant abandonment costs had been prudently incurred and should be amortized to rates, Dominion should not be allowed to earn a return on the unamortized balance of those costs on the theory that "[a] middle ground must be found on which the Company bears some of the risk of abandonment and the ratepayer is protected from unreasonably high rates." *Id.*

¶ 17        Furthermore, the Commission concluded that it had a "well-established history of allocating prudently incurred costs, specifically in the context of extraordinary, large costs such as environmental clean-up and plant cancellation costs, between ratepayers and shareholders in order to strike a fair and reasonable balance" and that "fairness dictate[d] this same treatment" in the present proceeding. According to the Commission, "[a] number of material facts in evidence call[ed] into question the prudence" of Dominion's coal ash-related costs, including the occurrence of groundwater violations and its refusal to build a dry waste storage facility at the Possum Point plant contrary to the standards for coal ash storage that the Environmental Protection Agency had adopted by that time. The Commission further noted that the total amount of coal ash-related costs that Dominion had incurred during the relevant period was "significant" and would affect the rates paid by end-

user customers. Finally, the Commission concluded that allowing Dominion to earn a return on the unamortized balance of the relevant coal ash-related costs would "violate[ ] the matching principle and raise[ ] intergenerational equity concerns" by requiring current customers to pay for the remediation of waste associated with past power generation. As authorized by N.C.G.S. § 62-133(d), the Commission stated that it had "consider[ed] these material facts of record when striking the appropriate balance between shareholder and customer interests to set just and reasonable rates" and concluded that "[a] fair and reasonable balance is found which requires [Dominion]'s shareholders to bear some of the risk of clean-up costs associated with CCR liabilities and protects the ratepayers from unreasonably high rates."

¶ 18        In determining that Dominion's coal ash costs should be amortized to rates over a period of ten years, the Commission found that Dominion's "proposed five-year amortization period does not achieve a fair balance in light of the evidence in the record, the magnitude and the nature of the costs involved and the rate impact to customers." On the other hand, the Commission declined to accept the Public Staff's proposed eighteen-year amortization period on the grounds that a ten-year amortization period struck a "more appropriate and fairer balance" and was consistent with the Commission's "historical treatment of major plant cancellations" as evidenced by the fact that the Commission had "consistently used a write-off period of 10 or fewer years for all major plant cancellations." *Application of Va. Elec. and*

*Power Co. for Auth. to Adjust and Increase Its Elec. Rates and Charges*, No. E-22, Sub 273, 73 N.C.U.C. Orders & Decisions 343, 355. As a result, the Commission authorized the amortization of the coal ash-related costs that Dominion had incurred between 1 July 2016 and 30 June 2019 to rates over a ten year period while disallowing Dominion's request to be allowed to earn a return on the unamortized balance of those costs.[2] Dominion noted an appeal to this Court from the Commission's order.[3]

## II.     Analysis

### A. Standard of Review

According to N.C.G.S. § 62-94 (2021), the applicable standard of review utilized by this Court in reviewing Commission orders requires us to

> decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the

---

[2] Before an appeal was noted to this Court from the Commission's order, both Dominion and the Public Staff filed motions seeking reconsideration and clarification of the Commission's decision. In upholding its decision to refrain from awarding Dominion a return on the unamortized balance of the deferred coal-ash-related costs, the Commission stated that it had "fully considered all of the facts in evidence, applied the various provisions of the Act to those facts in evidence and reached its decisions . . . in the interest of achieving just and reasonable rates." Similarly, in upholding its decision to require the use of a ten-year amortization period, the Commission stated that it had "fully considered all of the facts in evidence and the applicable precedents in reaching its decision to set the amortization period for CCR Costs at ten years."

[3] Although the Attorney General initially noted a cross-appeal from the Commission's order, he subsequently sought and obtained the entry of an order dismissing this cross-appeal.

case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1)     In violation of constitutional provisions, or

(2)     In excess of statutory authority or jurisdiction of the Commission, or

(3)     Made upon unlawful proceedings, or

(4)     Affected by other errors of law, or

(5)     Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6)     Arbitrary or capricious.

N.C.G.S. § 62-94(b).  A Commission decision is "arbitrary and capricious when, among other things, [it] indicate[s] a lack of fair and careful consideration or fail[s] to display a reasoned judgment." *State ex rel. Utils. Comm'n v. Thornburg*, 314 N.C. 509, 515 (1985).  In deciding whether to affirm, reverse, invalidate or remand the Commission's decision for further proceedings, we are required to review "the whole record or such portions thereof as may be cited by any party" and take "due account" of "the rule of prejudicial error."  N.C.G.S. § 62-94(c).

¶ 20     According to well-established North Carolina law, "the rates fixed or any rule, regulation, finding, determination, or order made by the Commission" are considered "prima facie just and reasonable." *Id*. at § 62-94(e).  For that reason,

> [t]he burden is on the appellant to demonstrate an error of
> law in the proceedings. To be arbitrary and capricious, the
> Commission's order would have to show a lack of fair and
> careful consideration of the evidence or fail to display a
> reasoned judgment.

*State ex rel. Utilities Comm'n v. Piedmont Nat. Gas Co.*, 346 N.C. 558, 573 (1997) (citations omitted). A reviewing court examines the Commission's findings of fact for the purpose of determining whether they are supported by "competent, material and substantial evidence," *State ex rel. Utils. Comm'n v. Cooper*, 367 N.C. 444, 448 (2014), with the Commission being "responsible for determining the weight and credibility to be afforded to the testimony of any witness, including any expert opinion testimony," and with the Commission's "decision being entitled to great deference given that its members possess an expertise in utility ratemaking." *State ex rel. Utilities Comm'n v. Stein*, 375 N.C. at 900. "Assuming adequate findings of fact, supported by competent, substantial evidence, the Commission's determination, reached pursuant to the mandate of N.C.G.S. § 62-133 and to the statutory procedural requirements, may not be reversed even if [this Court] would have reached a different conclusion upon the evidence." *Id.* (cleaned up) (quoting *State ex rel. Utils. Comm'n v. Morgan*, 277 N.C. 255, 266–67 (1970)). The Commission's conclusions of law are, however, subject to de novo review for legal error on appeal. *State ex rel. Utils. Comm'n v. N.C. Waste Awareness & Reduction Network*, 255 N.C. App. 613, 615 (2017), *aff'd per curiam*, 371 N.C. 109 (2018).

**B. Denial of a Return on the Unamortized Balance of CCR Costs**

¶ 21        In its initial challenge to the Commission's order, Dominion argues that the Commission erred by rejecting its request to be allowed to earn a return on the unamortized balance of its coal ash-related costs.  According to Dominion, the Commission "failed to set forth *any* facts to support its break with its own precedent" that was established in the 2016 Dominion rate case and 2017 Duke Energy rate cases, with this failure to follow its own past precedent compelling the conclusion that the Commission had acted arbitrarily and capriciously in violation of the Public Utilities Act and the relevant provisions of the state and federal constitutions.

¶ 22        According to Dominion, this Court held in *Stein* that the Commission had correctly determined that the Duke Energy utilities should be allowed to earn a return on the unamortized balance of their coal ash costs, with the findings that the Commission had made in that case having sufficed to establish that the enactment of the CCR Rule and certain North Carolina statutory provisions "forced the utilities to confront an 'extraordinary and unprecedented' issue involving the potential expenditure of billions of dollars in order to address a significant environmental problem" and that, in light of "the 'magnitude, scope, duration and complexity' of the anticipated costs" of coal ash cleanup, a return on the unamortized balance was fair and just.  *Stein*, 375 N.C. at 926.  Dominion claims that, since the facts at issue in this case are similar to those that were before the Commission in *Stein*, the

Commission acted arbitrarily and capriciously "by exercising its discretion differently and to the detriment of [Dominion] in this case after exercising it to the benefit of Duke Energy."

¶ 23        After conceding that Commission decisions are "not automatically binding on future Commissions," Dominion contends that the Commission "explicitly chose to give its ratemaking treatment of coal ash costs in the 2016 [Dominion] rate case decision precedential value" in deciding the 2017 Duke Energy rate case and that the Commission "provided no reasoned basis for departing from its 2016 [Dominion] Rate Case Order" when deciding this case, even though it "involved the same coal plants and same types of costs." In Dominion's view, even though the Commission heard the "same theories" regarding the imprudence with which coal combustion residuals had been handled in this case that it had heard in the 2016 Dominion rate case and 2017 Duke Energy rate cases, it "reached a different result — denying a return on prudently incurred costs — without ever concluding that [Dominion] imprudently managed its coal ash." As a result of the fact that the Commission found that the record did not support a finding of imprudence even though the evidence "raise[d] questions" about the prudence with which Dominion's coal ash-related costs had been incurred and that, "given the passage of time and evolving regulatory standards," Dominion was entitled to a presumption of prudency, the Commission "arbitrarily

and unlawfully created a separate, lower standard" by finding that Dominion's conduct was less than prudent but more than imprudent.

¶ 24        Furthermore, Dominion argues that the Commission had acted arbitrarily and capriciously by determining that Dominion's coal ash-related costs did not constitute property that was "used and useful" after reaching the opposite conclusion in the 2016 Dominion rate case, in which it had determined that "existing CCR repositories continue to be used and useful for storing CCRs, and will continue to be used and useful until [Dominion] moves the CCRs to a permanent repository." Dominion claims that the arbitrary and capricious nature of the Commission's order is demonstrated by the fact that it allows a return on the company's coal ash-related costs during the deferral period, which ran from 1 July 2016 through 30 June 2019, while refusing to allow a return on those same costs during the subsequent recovery period.

¶ 25        In Dominion's view, "[t]he coal ash costs at issue in this case deserved, but did not receive, the same treatment" that they had received in the 2016 Dominion rate cases and the 2017 Duke Energy cases. Dominion claims that, even though "[a]ny differences that exist between [Dominion] and Duke Energy warrant more favorable ratemaking treatment for" Dominion given that Duke Energy had pled guilty to the commission of environmental crimes, including criminal negligence, while there had been no similar findings of mismanagement or unlawful activity on the part of

Dominion, "[Dominion] finds itself in a far worse position than Duke Energy." According to Dominion, the Commission "failed to articulate any grounds for treating [Dominion] differently than Duke Energy" and, in spite of the fact that the Commission is "not bound by the doctrines of *res judicata* or *stare decisis*, the Commission cannot 'arbitrarily' disregard its own precedent," quoting N.C.G.S. § 62-94(c) and *State ex rel. Utils. Comm'n v. Nantahala Power & Light Co.*, 326 N.C. 190, 199 (1990) (holding that, although "the Commission is not covered by our Administrative Procedure Act," it is "still an administrative agency of the state government, and general tenets of administrative law are applicable to its operation except where modified by statute"). In spite of this fact, Dominion contends that the Commission's "discussion of the 2016 [Dominion] rate case is limited to explaining that a stipulation precludes it from being considered precedent here" even though that decision "was accepted as precedent in the Duke Energy rate cases," with the Commission's failure to explain the reasons for its decision to treat the two utilities differently constituting arbitrary and capricious decision-making.

¶ 26        Finally, Dominion asserts that the Commission's failure to afford equal treatment to Duke and Dominion violates the equal protection clauses of the state and federal constitutions, with the company having directed our attention to *Cheek v. City of Charlotte*, 273 N.C. 293 (1968), in which this Court held that legislation prohibiting the provision of massages to a member of the opposite sex at massage

parlors, but not at barber shops or health clubs, was arbitrary and constituted impermissibly discriminatory legislation, and *Connecticut Light & Power Co. v. Fed. Energy Regul. Comm'n*, 627 F.2d 467, 473 (D.C. Cir. 1980), in which the United States Court of Appeals for the District of Columbia Circuit noted that "treating regulated entities, whose apparent fact situation is stipulated to be the same, in a markedly different manner might give rise to an Equal Protection problem." According to Dominion, the Commission's "fail[ure] to articulate any factors or rational basis for subjecting [Dominion] to different treatment than identically situated North Carolina electric utilities" violated Dominion's right to equal protection.

¶ 27    In seeking to persuade us to affirm the Commission's order, the Public Staff argues that the Commission properly exercised its authority pursuant to N.C.G.S. § 62-133(d) by determining that Dominion should not be allowed to earn a return upon the unamortized balance of its coal ash-related costs. The Public Staff notes that the Commission's ratemaking decisions are not subject to stare decisis or res judicata principles in light of the fact that such decisions are legislative, rather than judicial, in nature given that in, "fixing rates . . . the Commission [exercises] a function delegated to it by the legislative branch of government." *State ex rel. Utils. Com. v. Thornburg*, 325 N.C. 463, 469 (1989) (holding that, since the Commission was exercising a legislative function, the manner in which it provided for the inclusion of nuclear cancellation costs in rates in prior cases was not entitled to res judicata

effect); *see also State ex rel. Utils. Com. v. Carolina Util. Customers Ass'n*, 348 N.C. 452, 472 (1998) (stating that "[a] final order of the [Commission] in a general rate case is not within the doctrine of *stare decisis*").

¶ 28        According to the Public Staff, the Commission made sufficient findings of fact to "explain[ ] why a divergence from the usual ratemaking standards would be appropriate and why the approach that the Commission ha[d] adopted would be just and reasonable to both utilities and their customers" as required by this Court's decision in *Stein*, 375 N.C. at 926. As an initial matter, the Public Staff points to the Commission's discussion of three previous rate cases that involved including in rates the "extraordinary, large costs such as environmental clean-up and plant cancellation" costs and in which the Commission had apportioned the responsibility for those costs "between ratepayers and shareholders" by amortizing the costs to rates while denying the utility's request to be allowed to earn a return on the unamortized balance. Secondly, the Public Staff directs our attention to the Commission's finding that a "number of material facts in evidence call into question the prudence of [Dominion's] actions and inaction and the risks accepted by [Dominion] management" at the utility's coal ash disposal sites, arguing that this evidence provides further support for the Commission's decision to require sharing of those costs between Dominion and its customers. *See Stein*, 375 N.C. at 931 (reversing the Commission's order, in part, and holding that the Commission was required "to evaluate the extent

to which the utilities committed environmental violations" in setting the utility's rates pursuant to N.C.G.S. § 62-133(d) "even if any such environmental violations did not result from imprudent management"). Thirdly, the Public Staff notes the Commission's reference to the "matching principle," which "dictates that customers who use an asset should pay for the asset at the time it is used" instead of requiring "present and future customers [to] pay for costs incurred related to service provided in the past." Fourthly, the Public Staff notes that utilities are generally required to collect asset retirement costs over the useful life of the asset, with the Commission having found that its order was "further supported by the failure of [Dominion] to properly account for the full decommissioning costs of its coal-fired power plants" and Dominion's failure to include those costs in rates during the period when those facilities were actually being used to generate electricity.

¶ 29        The Public Staff denies that the Commission had erred by failing to make the same findings and conclusions in this case that it made in the 2016 Dominion rate case and the 2017 Duke Energy rate cases. In the Public Staff's view, the Commission did, in fact, provide a "reasoned basis for departing from" its decision in the 2016 Dominion order by pointing out that the 2016 order explicitly stated that it did "not have precedential value with respect to the [coal ash] issues" that were before the Commission in that case because the 2016 Dominion rate case involved a stipulation between Dominion and the Public Staff instead of having been fully litigated.

Similarly, the Public Staff contends that the Commission did not err by reaching a different outcome in this case than it had in the 2017 Duke rate cases, at least, in part, because the 2017 Duke rate cases were on appeal when this case was heard and decided and because the Commission's orders in those cases were ultimately reversed by this Court in *Stein*, resulting in a settlement between Duke and certain intervenors that was markedly less favorable to Duke than the Commission's initial orders. Finally, the Public Staff argues that the Commission's decision does not work any sort of equal protection violation given that such challenges to a utility ratemaking decision must be rejected as long as the Commission's decision is rationally related to a legitimate government purpose, which this one clearly is.

¶ 30        The rates for utility service charged by North Carolina retail ratepayers must be "just and reasonable." N.C.G.S. § 62-131. For that reason, the Commission is required to fix rates that are "fair both to the public utilities and to the consumer," N.C.G.S. § 62-133(a), by

> (1)    Ascertain[ing] the reasonable original cost or the fair value under G.S. 62-133.1A of the public utility's property used and useful . . . in providing the service rendered to the public within the State, less that portion of the cost that has been consumed by previous use recovered by depreciation expense.
> . . . .
>
> (2)    Estimat[ing] such public utility's revenue under the present and proposed rates.

(3)    Ascertain[ing]    such    public    utility's    reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.

(4)    Fix[ing] such rate of return on the cost of the property ascertained pursuant to subdivision (1) of this subsection as will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, including, but not limited to, the inclusion of construction work in progress in the utility's property under sub-subdivision b. of subdivision (1) of this subsection, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors.

N.C.G.S. § 62-133(b). In addition, the Commission is required, during the ratemaking process, to "consider all other material facts of record that will enable it to determine what are reasonable and just rates." *Id.* § 62-133(d).

¶ 31    According to N.C.G.S. § 62-79(a), "all final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include" "[f]indings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record." According to well-established North Carolina law, "[t]he Commission . . . is not required to 'comment upon every single fact or item of evidence presented by the parties.' " *State ex rel. Utils. Comm'n v. Public Staff-N.C. Util. Comm'n,* 323 N.C. 481, 496-97 (1988) (quoting *State ex rel.*

*Utils. Comm'n v. Eddleman*, 320 N.C. 324, 351 (1987)). Instead, "[t]he Commission's summary of the appellant's argument and its rejection of the same is sufficient to enable the reviewing court to ascertain the controverted questions presented in the proceeding," which is all that is required. *State ex rel. Utils. Comm'n v. Conservation Council of N.C.*, 312 N.C. 59, 62 (1984). As a result, this Court has held that findings of fact that "demonstrate that the Commission considered the impact of changing economic conditions upon customers" and that "specify how this factor influenced the Commission's decision to authorize a 10.2% [return on equity]," *State ex rel. Utils. Comm'n v Cooper*, 367 N.C. 741, 748 (2015), were sufficient to pass muster on appellate review.

¶ 32 The essence of the argument that Dominion has presented for our consideration in this case is that, since the facts contained in the record developed in this case were essentially identical to those contained in the records developed in the company's 2016 rate case and in the 2017 Duke Energy rate cases, the Commission erred by failing to conclude that Dominion was entitled to earn a return on the unamortized balance of its coal ash-related costs consistently with the decisions that the Commission had made in those earlier proceedings. In *Stein*, we addressed the issue of whether the Commission possessed the discretion, pursuant to N.C.G.S. § 62-133(d), to allow utilities to earn a return on their coal ash cleanup and recovery costs, even if such costs were characterized as operating expenses rather than as property

used and useful. 375 N.C. at 914. In holding that the Commission possessed the authority to act in this fashion, we noted that, even though the procedures for establishing just and reasonable rates as outlined in N.C.G.S. § 62-133(b) "provide a workable framework" for setting just and reasonable rates for utility service, the circumstances at issue in that case were "anything but ordinary, with the coal ash-related costs that [Duke Energy had] incurred between 1 January 2015 and 31 December 2017 not being readily susceptible to traditional ratemaking analysis for a number of reasons." *Id*. at 921.

¶ 33        After a thorough analysis of this Court's prior decisions interpreting the nature and extent of the Commission's authority pursuant to N.C.G.S. § 62-133(d), we determined that our precedent "clearly indicated that N.C.G.S. § 62-133(d) is available to the Commission for the purpose of dealing with unusual situations and that the authority granted to the Commission pursuant to N.C.G.S. § 62-133(d) is not limited by the more specifically stated ratemaking principles set out elsewhere in N.C.G.S. § 62-133(b)." *Id*. at 925. As a result, we held that

> the Commission may employ N.C.G.S. § 62-133(d) in situations involving (1) unusual, extraordinary, or complex circumstances that are not adequately addressed in the traditional ratemaking procedures set out in N.C.G.S. § 62-133; (2) in which the Commission reasonably concludes that these circumstances justify a departure from the ordinary ratemaking standards set out in N.C.G.S. § 62-133; (3) determines that a consideration of these "other facts" is necessary to allow the Commission to fix rates that are just and reasonable to both the utility and its

> customers; and (4) makes sufficient findings of fact and
> conclusions of law supported by substantial evidence in
> light of the whole record explaining why a divergence from
> the usual ratemaking standards would be appropriate and
> why the approach that the Commission has adopted would
> be just and reasonable to both utilities and their customers.

*Id*. at 926.

¶ 34        In applying the four-part test enunciated in *Stein* to the facts at issue in that

proceeding, we determined that the Commission had not erred "by allowing the

amortization of deferred coal ash costs to rates" and by allowing Duke Energy "to

earn a return on the unamortized balance" of those costs in that case given that "the

enactment of CAMA forced [Duke Energy] to confront an 'extraordinary and

unprecedented' issue involving the potential expenditure of billions of dollars in order

to address a significant environmental problem" and that, "[i]n light of the

'magnitude, scope, duration and complexity' of the anticipated costs," a return on the

unamortized balance of the costs would reasonable. *Id*. at 926. On the other hand,

we also held that, once the Commission had decided to invoke its authority pursuant

to N.C.G.S. § 62-133(d) to consider "other facts," it "was required to consider *all*

material facts of record . . . including, in these cases, facts pertaining to alleged

environmental violations such as non-compliance with NPDES permit conditions,

unauthorized discharges, and groundwater contamination from the coal ash

basins[.]" *Id*. at 931. In view of the fact that the Commission "appear[ed] to have

determined that it lacked the authority to comment upon the nature and extent of

any environmental violations that the utilities may or may not have committed" in setting rates pursuant to N.C.G.S. § 62-133(d), we reversed the portion of the Commission's order that rejected the Public Staff's "equitable sharing" proposal and remanded this case to the Commission for further proceedings, including the making of appropriate findings of fact and conclusions of law relating to the validity of the Public Staff's proposal. *Id.* at 932–33.

¶ 35        Over two decades ago, this Court upheld the Commission's use of its discretionary authority pursuant to N.C.G.S. § 62-133(d) to allow a utility to amortize nuclear plant cancellation costs while rejecting the utility's request to earn a return on the unamortized balance of those costs in *State ex rel. Utilities Comm'n v. Thornburg*, 325 N.C. 463 (1989). In *Thornburg*, the utility sought a general rate increase that was predicated, in part, upon an attempt to reflect the costs associated with the abandonment of a proposed nuclear generating facility at the Shearon Harris nuclear plant in its retail rates. *Id.* at 465. In its opinion, the Court noted that, in a previous rate case regarding two other cancelled nuclear units at the Shearon Harris site, the Commission had allowed the utility to amortize the cancellation costs associated with the two other units "over a ten-year period" while determining that "no return [would be] allowed on or with respect to the unamortized balance" of the cancellation costs. *Id.* at 466. In the case that was actually before this Court, the Commission allowed the utility to amortize the relevant cancellation

costs to rates over a period of ten years without allowing the utility to earn a return on the unamortized balance. On appeal, the Attorney General argued that the Commission had acted beyond the scope of its statutory authority in allowing the utility to amortize any of the relevant nuclear plant cancellation costs to rates and that his ability to advance this argument was not precluded by the doctrine of res judicata arising from the Commission's earlier decision. *Id*. at 467.

¶ 36      In holding that "the Commission's treatment of cancellation costs in prior orders is not res judicata in this proceeding," *id*. at 471, we noted that,

> in addressing the issue of whether a Commission order can be deemed res judicata this Court has held that "only specific questions actually heard and finally determined by the Commission in its *judicial* character are *res judicata*, and then only as to the parties to the hearing." *Utilities Commission v. Area Development, Inc.*, 257 N.C. 560, 570, 126 S.E.2d 325, 333 (1962) (emphasis added). Moreover, this Court has stated that ratemaking activities of the Commission are a legislative function. *Utilities Comm. v. Edmisten, Attorney General*, 294 N.C. 598, 603, 242 S.E.2d 862, 866 (1978); *Utilities Commission v. General Telephone Company*, 281 N.C. 318, 336, 189 S.E.2d 705, 717 (1972). It follows that[,] since the exercise of the Commission's ratemaking power is a legislative rather than a judicial function, such orders are not governed by the principles of res judicata and are reviewable by this Court in later appeals of closely related matters.

*Id*. at 468. After determining that the Commission had the authority to treat costs associated with the cancellation of the third nuclear unit at the Shearon Harris facility differently than it had treated the first two, we further held that the

Commission did "not err as a matter of law in authorizing [the utility] to continue to recover a portion of the cancellation costs of the abandoned Harris Plant as operating expenses through amortization" in light of its discretion "to consider all material facts in the record in determining rates" pursuant to N.C.G.S. § 62-133(d). *Id*. at 476.

¶ 37        Similarly, we held in *State ex rel. Utils. Comm'n. v. Carolina Util. Customers Ass'n,* that, while "prior decisions of this Court regarding general questions of law" relevant to the ratemaking process were entitled to stare decisis effect, "the final order of the Commission in a general rate case is not within the doctrine of stare decisis[.]" 348 N.C. 452, 472 (1998) (cleaned up) (quoting *State ex rel. Util. Comm'n v. Carolina Power & Light Co.,* 250 N.C. 421, 430 (1959)). Thus, well-established principles of North Carolina law establish that prior Commission decisions, as compared to prior decisions of this Court, are not entitled to either res judicata or stare decisis effect. In light of that fact, we have no difficulty in holding that the Commission was not obligated to make the same decision with respect to the manner in which Dominion was entitled to reflect the costs associated with coal ash remediation in rates in this case that it made in the 2016 Dominion rate case or the 2107 Duke rate cases.[4]

---

[4] As an aside, we note that the concept of stare decisis requires, in essence, that a court identify certain material differences between the case that is currently before the court and potentially-relevant precedent before declining to follow that precedent A requirement that the Commission explicitly distinguish prior precedent as a precondition for declining to follow it seems, aside from having no support of any nature in this Court's precedent, to be

¶ 38        In addition, we are unable to conclude that the Commission acted arbitrarily and capriciously in approving different ratemaking treatments for the coal ash-related costs at issue in this case as compared to those at issue in the 2016 Dominion general rate case and 2017 Duke general rate cases. Instead of indicating the absence "of fair and careful consideration or [the] fail[ure] to display a reasoned judgment," *Thornburg*, 314 N.C. at 515, the Commission's order in this case demonstrated a thorough consideration of the record evidence, adequately explained the reasons for the decision that the Commission did make, and reflected a ratemaking treatment of the relevant costs that failed to track the proposals made by either the utility or the Public Staff.

¶ 39        As evidence of its even-handed consideration of the matters at issue in this case, we note that the Commission's order contains a detailed summary of the circumstances surrounding Dominion's incurrence of the coal ash-related costs and

inconsistent with the basic principle of North Carolina ratemaking law that prior Commission decisions do not have stare decisis effect. The decisions upon which Dominion relies in arguing for the imposition of such a requirement in this case, such as *Nat'l Weather Serv. Employees Org. v. FLRA*, 966 F.3d 875 (D.C. Circ. 2020) (dispute over a termination provision in a collective bargaining agreement); *New Eng. Power Generators Ass'n v. FERC*, 881 F.3d 202 (D.C. Circ. 2018) (appellate review of a complaint alleging that an independent transmission system operator's tariff was unreasonably discriminatory); *West Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) (determination of which rate applied when more than one had been filed); *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822 (D.C. Cir. 2012) (employer challenge to the certification of a union election); *BB&L, Inc. v. NLRB*, 52 F.3d 366 (D.C. Cir. 1995) (employer refusal to bargain with a union), all appear to have been made in the context of adjudication proceedings conducted pursuant to the federal Administrative Procedure Act, 5 U.S.C. § 554 (2022), rather than any sort of proceeding that is functionally equivalent to a general rate case conducted pursuant to N.C.G.S. § 62-133.

an explanation of the reasons that it had questions concerning the extent to which Dominion had acted prudently, which included the nature and extent of the exceedances associated with groundwater contaminants related to Dominion's coal ash storage facilities, instances of late and deficient groundwater monitoring, and Dominion's decision to ignore a recommendation for the construction of a dry waste disposal facility at a particular site. In addition, the Commission highlighted the risks inherent in certain of the decisions that Dominion had made with respect to the relevant coal ash-related costs, including the fact that, prior to enactment of the CCR Rule, Dominion had deemed unlined ponds to be a permanent storage solution for coal ash and had planned to close its existing wet storage facilities in place, an approach that would have allowed the continued leaching of coal combustion residuals into the groundwater.

¶ 40        Acknowledging that the record did not provide "substantial evidence" to support the making of a full and informed decision concerning the prudence of the manner in which the relevant coal ash-related costs had been incurred, the Commission concluded that "none of the CCR Costs incurred by the Company between July 1, 2016 through June 30, 2019 [would] be disallowed on the basis of having been imprudently incurred" and authorized Dominion to amortize all of those costs to rates. On the other hand, the Commission rejected Dominion's request to be allowed to earn a return on the unamortized balance of the relevant coal ash-related

costs after considering multiple factors, such as the Commission's "history of allocating prudently incurred costs, specifically in the context of extraordinary, large costs such as environmental clean-up and plant cancellation, between ratepayers and shareholders"; the evidence that called the prudence with which the relevant coal ash-related costs had been incurred into question; the "significant" costs that were at issue in this case, which would have resulted in material additions to the amount that each of Dominion's North Carolina retail ratepayers would have had to pay had the company's proposal been adopted; and a concern that approval of Dominion's proposed treatment of the relevant costs would violate the "matching" principle and raise significant concerns for intergenerational equity.

¶ 41        As a result of the fact that the Commission's findings of fact are "supported by competent, substantial evidence" and the fact that the basis for the Commission's decision is adequately explained in its order and reflects an accurate understanding of North Carolina ratemaking law as set out in prior decisions from this Court, *Stein*, 375 N.C. at 900, we have no legal basis for disturbing the Commission's order in this case. Although Dominion's dissatisfaction with the Commission's order is understandable, it has failed to show that the Commission's decision lacks adequate record support, misapplies the applicable ratemaking statutes, or fails to embody a reasoned decision. Instead, at the end of the day, Dominion's challenge to the Commission's order amounts to little more than a belief that the Commission should

have weighed the evidence differently and reached a different result and that we should intervene to require that a different outcome be reached in spite of the fact that "[t]he Commission is responsible for determining the weight and credibility to be afforded to the testimony of any witness, including any expert opinion testimony" and the fact that the Commission's decision is "entitled to great deference." *Stein*, 375 N.C. at 900.

¶ 42        In addition, we note that, even if Dominion's argument that the Commission was required to follow its earlier decisions in the 2016 Dominion rate case and the 2017 Duke rates cases or to explain its reasons for failing to do so had merit, which it does not, the record contains ample support for any decision that the Commission might have made to refrain from doing so. As we have already noted, the Commission's order in the 2016 Dominion rate case rested upon a settlement between the parties, with both the stipulation itself and the resulting Commission order having made it abundantly clear that any decision that the Commission might make in that proceeding would not be deemed to have precedential effect, *Application of Va. Elec. & Power Co., d/b/a Dominion N.C. Power, for Adjustment of Rates and Charges Applicable to Elec. Util. Serv. in N.C.*, Docket No. E-22, Sub 532, 2016 N.C. PUC LEXIS 1183, at *137–39 (N.C.U.C. Dec. 22, 2016), in light of the Commission's statement that Dominion and the Public Staff had "agree[d] that the appropriate amortization period for future CCR expenditures shall be determined on a case-by-

case basis"; that there would be no "prejudice to the right of any party to take issue with the amount or the treatment of any deferral of ARO costs in a rate case or other appropriate proceeding"; that Dominion and the Public Staff "reserve[d] their rights in the Company's next general rate case to argue . . . (a) how the unamortized balance of deferred CCR expenditures . . . should be addressed; and (b) how reasonable and prudent CCR expenditures incurred by the Company . . . should be recovered"; and that the Public Staff's agreement to the stipulation should "not be construed as a recommendation that the Commission reach any conclusions regarding the prudence and reasonableness of the Company's overall CCR plan." *Id.* As a result, one of the decisions upon which Dominion relies in support of its "precedent-based" argument expressly disclaims any idea that precedent had actually been created.

¶ 43        Dominion's reliance on the Commission's orders in the 2017 Duke rate cases is equally misplaced. Although the Commission did, to be sure, allow the Duke companies to amortize their coal ash-related costs to rates over a five-year period and to earn a return on the unamortized balance in their initial orders in these cases, the Commission also imposed substantial mismanagement penalties upon the Duke utilities that were not imposed upon Dominion in this case. In addition, the facts surrounding the manner in which Dominion and the Duke companies incurred their coal ash-related costs were, as is reflected in the relevant Commission orders, markedly different. Finally, the 2017 Duke rate orders were partially overturned on

appeal and remanded for further consideration by the Commission, eventually resulting in a settlement that reduced the amount of coal ash-related costs included in the rates charged by the Duke companies to their North Carolina retail ratepayers by "more than $900 million." Under this set of circumstances, it is hard for us to see how the Commission's refusal to explain why it failed to follow decisions that were, at the time, pending on appeal could possibly constitute prejudicial error. N.C.G.S. § 62-94(c) (requiring reviewing courts to take due account of "the rule of prejudicial error").[5] As a result, the 2017 Duke rate orders that the Commission unlawfully, at least in Dominion's eyes, failed to follow did not involve the same ratemaking treatment for which Dominion contends, rested upon differing sets of facts, and did not actually control the manner in which Duke's coal ash-related costs were reflected in the companies' rates.

¶ 44    As a result, given that the Commission's ratemaking decisions involve the exercise of legislative authority and the fact that "only specific questions actually heard and finally determined by the Commission in its judicial character are res

---

[5] In our view, moreover, the Commission adequately discussed its reasons for failing to follow the prior Duke Energy orders by noting that they were on appeal at that time and by mentioning those orders no less than eight times in discussing the manner in which coal ash-related costs should be reflected in Dominion's rates. In view of the fact that the Commission explained the reasons that it rejected Dominion's position and referenced the Duke Energy orders multiple times, we have difficulty seeing what additional clarity would have been provided to the Commission's order by the inclusion of language explicitly stating why it had not followed the result reached in the Duke Energy orders that were later overturned on appeal.

judicata, and then only as to the parties to the hearing," *Thornburg*, 325 N.C. at 468, we hold that the Commission did not err by focusing its analysis upon the nature and extent of the coal ash-related costs that Dominion sought to have included in the calculation of its North Carolina retail rates and that the Commission was not obligated to adopt the same ratemaking treatment for the costs at issue in this case that it adopted in the 2016 Dominion rate order and the 2017 Duke rate orders. For the same reason, the Commission did not violate the equal protection clauses of the state and federal constitutions by reaching a different result in this case than it did in the decisions upon which Dominion relies. Finally, we hold that the Commission adequately explained the basis for the decision that it actually made with respect to the issue of whether Dominion should have been allowed to earn a return upon the unamortized balance of the relevant coal ash-related costs. As a result, we hold that Dominion's challenge to the Commission's failure to allow it to earn a return on the unamortized balance of its coal ash-related costs did not involve any error of law.

**C. Ten-Year Amortization Period**

Secondly, Dominion argues that the Commission's determination that the coal ash-related costs at issue in this case should be amortized over ten years was arbitrary and capricious given that the Commission had determined in the 2016 Dominion rate case that a five-year period would be beneficial for both Dominion and ratepayers and that the Commission had failed to give an adequate explanation for

its decision to use a ten-year, rather than a five-year, amortization period in this case. More specifically, Dominion argues that, "[w]hile it is true that the ten-year amortization period adopted by the Commission meets the outer bounds of the standard it adopted for cancelled nuclear plants," "*only* a five-year amortization period would be consistent with the Commission's treatment of coal ash costs *and* nuclear abandonment costs," with the Commission having erred by failing to rely on more recent and applicable decisions "involving 'identical' coal ash costs" rather than earlier nuclear plant abandonment costs.

¶ 46     As we understand its brief, the logic upon which Dominion relies in asserting that the Commission erred by requiring the use of a ten-year, rather than a five-year, amortization period in this case is essentially identical to the logic upon which Dominion relied in arguing that the Commission erred by failing to permit it to earn a return on the unamortized balance of the relevant coal ash-related costs. In essence, Dominion argues that, since the Commission found a five-year amortization period to be reasonable in both the 2016 Dominion rate case and the 2017 Duke Energy rate cases and since, "[i]n contrast to this line of precedent, the Commission now prescribes a ten-year amortization period" without "explain[ing] why [it] previously adopted [a] five-year amortization period, for the same costs," the Commission's decision with respect to the length of the applicable amortization period is arbitrary and capricious.

¶ 47        The same logic that persuades us that the Commission did not err by declining to allow Dominion to earn a return on the unamortized balance of the company's coal ash-related costs persuades us that the Commission did not err by approving the use of a ten-year, rather than a five-year, period for the amortization of those costs.  In addition to the fact that the record developed in this case differs from those developed in the other cases, the fact that the 2016 Dominion order expressly stated that it was not entitled to precedential effect, and the fact that the ratemaking treatment approved in the 2017 Duke rate cases was changed upon remand from our decision in *Stein*, we note that the Commission found that the use of a ten-year period struck a "more appropriate and fairer balance" than the use of either a longer or a shorter amortization period and the use of a ten-year amortization period was consistent with its "historical treatment of major plant cancellations."  *Application of Va. Elec. and Power Co. for Auth. to Adjust and Increase Its Elec. Rates and Charges*, No. E-22, Sub 273, 73 N.C.U.C. Orders & Decisions 343, 355.  Although the record would have also supported a decision to reach the result which Dominion believes to be appropriate, the Commission's choice of a ten-year, rather than a five-year, amortization period appears to have a reasonable basis in both the record and the Commission's findings. As a result, we hold that the Commission did not commit any error of law in approving the use of a ten-year, rather than a five-year, period for amortizing Dominion's coal ash-related costs.

### III.    Conclusion

After a careful review of the entire record, we conclude that the Commission's order is supported by competent, substantial evidence and that the Commission adequately explained the basis for the portions of its decision that Dominion has challenged on appeal.  As a result, the Commission's decision is affirmed.

AFFIRMED.

Justice BARRINGER dissenting.

The issue I address today is whether the Utilities Commission needed to explain why it departed from its reasoning in two cases that were decided less than two years prior, had materially similar facts, and were brought to the Commission's attention. While I agree with much of the majority's discussion of this case, I cannot accept its holding that the Commission did not even need to acknowledge the two Duke Energy (Duke) cases relied upon by Dominion Energy (Dominion) when Dominion requested a rate increase. Under general tenets of administrative law, an agency's failure to explain a departure from recent, applicable past decisions when they were brought to its attention is arbitrary and capricious. North Carolina administrative law should be no different. Otherwise, an agency can treat two similarly situated entities differently without having to directly explain why. Such arbitrary and capricious decision-making will only serve to undermine trust in our government. The matter should be remanded to address the issue discussed herein. Accordingly, I respectfully dissent.

## I.    Relevant Facts

On 29 March 2019, Dominion Energy applied to the Commission for a general rate increase. *Application of Va. Elec. & Power Co., d/b/a Dominion Energy N.C. for Adjustment of Rates and Charges Applicable to Elec. Serv. in N.C.*, Docket No. E-22,

Sub 562 & Sub 566, slip op. at 3 (N.C.U.C. Feb. 24, 2020).[1] As part of the rate increase, Dominion sought to recover CCR compliance expenses incurred from 1 July 2016 to 30 June 2019 through a five-year amortization period as well as a return on the unamortized balance. *Id.* at 86. Dominion requested this recovery method as the Commission had allowed it in three prior decisions, one involving Dominion in 2016 and two involving Duke in 2018. The Commission, however, denied Dominion's request, instead allowing it a ten-year amortization period and no return on the unamortized balance. *Id.* at 15. As the Public Staff concedes, at no point in the order did the Commission explain what distinguished Dominion's case from the two Duke cases, even though both had materially similar facts.

## II.    Analysis

¶ 51        Dominion Energy contends that the Commission's failure to provide any explanation directly addressing why it did not allow Dominion the same recovery as Duke was arbitrary and capricious. In response, the Public Staff argues that while "the Commission did not expressly distinguish those orders . . . the Commission's extensive explanation" for why it did not allow Dominion Energy a five-year amortization period and a return on coal costs "provided an adequate explanation for why it broke with the different policy that it had adopted in the 2018 Duke orders."

---

[1] Currently available at: https://starw1.ncuc.gov/NCUC/ViewFile.aspx?Id=7c1dc9e1-1bdb-4840-8692-6b329c980225.

Additionally, the Public Staff contends that even if the Commission erred by failing to expressly distinguish the Duke cases, remand would serve no purpose since this Court reversed the Duke orders in *State ex rel. Utilities Commission v. Stein*, 375 N.C. 870 (2020).

¶ 52        The Commission does not have "unbridled discretion in exercising its judgment." *State ex rel. Utils. Comm'n v. Thornburg*, 314 N.C. 509, 516 (1985). Instead, this Court may reverse a decision of the Commission if it is arbitrary or capricious. N.C.G.S. § 62-94(b)(6) (2021). "To be arbitrary and capricious, the Commission's order would have to show a lack of fair and careful consideration of the evidence or fail to display a reasoned judgment." *State ex rel. Utils. Comm'n v. Piedmont Nat. Gas Co.*, 346 N.C. 558, 573 (1997).

¶ 53        After careful review, I cannot find a case where this Court has addressed whether or not the Commission must explicitly explain why it departed from a recently decided case with materially similar facts that was brought to its attention. However, this Court has previously recognized that "[w]hile the Commission is not covered by our Administrative Procedure Act[,] . . . the Commission is still an administrative agency of the state government, and general tenets of administrative law are applicable to its operation except where modified by statute." *State ex rel. Utils. Comm'n v. Nantahala Power & Light Co.*, 326 N.C. 190, 199–200 (1990). Looking to the general tenets of administrative law, "[i]t is textbook administrative

law that an agency must provide[ ] a reasoned explanation for departing from precedent or treating similar situations differently." *New England Power Generators Ass'n, Inc. v. Fed. Energy Regul. Comm'n*, 881 F.3d 202, 210 (D.C. Cir. 2018) (second alteration in original) (quoting *W. Deptford Energy LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014)); *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822, 827 (D.C. Cir. 2012) (noting that an agency "cannot 'ignore its own relevant precedent but must explain why it is not controlling[,]' *B B & L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995)"); *see also* 2 Am. Jur. 2d Admin. Law § 360 (2022).[2] Accordingly, though an administrative agency "need not address every precedent brought to its attention, it must provide an explanation where its decisions appear to be 'on point.'" *Nat'l Weather Serv. Emps. Org. v. Fed. Lab. Rels. Auth.*, 966 F.3d 875, 883–84 (D.C. Cir. 2020) (quoting *Brusco Tug & Barge Co. v. NLRB*, 247 F.3d 273, 277 (D.C. Cir. 2001)).

Here, the Commission never explained why, in this case, it allowed a different recovery for Dominion's CCR costs than the recovery it allowed for Duke's CCR costs

---

[2] While these decisions are not from this Court, they interpret the words "arbitrary" and "capricious" in the context of administrative law, specifically the federal Administrative Procedure Act (APA). Like N.C.G.S. § 62-94(b)(6), the APA instructs federal courts to reverse agency actions that are arbitrary and capricious. *Compare* 5 U.S.C. § 706(2)(A), *with* N.C.G.S. § 62-94(b)(6) (2021). While the cases are not binding, given the similar statutory language and context, their interpretation is persuasive. *See, e.g.*, *Reynolds Am. Inc. v. Third Motion Equities Master Fund Ltd*, 379 N.C. 524, 2021-NCSC-162, ¶ 7 ("[G]iven the well-developed body of law arising from the numerous appraisal cases decided in Delaware, we borrow freely from these cases to the extent we find their reasoning to be persuasive and applicable to the facts here.").

two years prior.[3] In the Duke cases, the Commission allowed Duke to recover its CCR costs through a five-year amortization period and receive a return on the unamortized costs. In contrast, in this case, the Commission only allowed Dominion to recover its CCR costs through a ten-year amortization period and not receive a return on the unamortized costs. The Commission's order in this case contained several reasons explaining why it allowed a ten-year amortization period with no return on the unamortized costs. However, none of those *reasons* relate to the Duke cases or explain why the Commission departed from the Duke cases.[4]

---

[3] In contrast, the Commission explicitly explained why it allowed a different recovery in this case than in the 2016 Dominion case. *Application of Va. Elec. & Power Co., d/b/a Dominion Energy N.C. for Adjustment of Rates and Charges Applicable to Elec. Serv. in N.C.*, Docket No. E-22, Sub 562 & Sub 566, slip op. at 122–23 (N.C.U.C. Feb. 24, 2020). Specifically, the Commission noted that the 2016 case did "not have precedential value" and that the evidence presented in the 2016 case was "far less extensive" than the evidence in this case. *Id.*

[4] The order only mentions the Duke cases in two sections. First, in its findings of fact, the Commission found that "Duke Energy Carolinas, LLC (DEC), and Duke Energy Progress, LLC (DEP)" have an "authorized rate of return on common equity" of "9.90%." *Id.* at 8–9. The Commission then included a citation for the two 2018 Duke cases. *Id.* at 9 n.3. As part of the citation, the Commission included the subsequent history of the Duke cases in accordance with Bluebook rule 10.7.1(a). *See The Bluebook: A Uniform System of Citation* R. 10.7.1(a), at 110 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020). In other words, within the citation to the DEC case, the Commission properly included the clause "*appeal docketed*, No. 401A18 (N.C. Nov. 7, 2018)," and within the citation to the DEP case the Commission properly included the clause "*appeal docketed*, No. 401A18 (N.C. Nov. 7, 2018)" which were required by Bluebook Rule 10.7.1(a) because the cases were on appeal at that time. *Application of Va. Elec. & Power Co.,* slip op. at 9. These citation clauses are the only mention of the Duke cases being on appeal in the entire order. Therefore, it cannot seriously be maintained that these two clauses, in a citation, in a footnote, constitute adequate discussion of the Commission's reasons for failing to follow the prior Duke Energy orders. The cases were cited for the authorized rate of return on common equity allowed Duke Energy, not to explain why the Commission did not follow their treatment of CCR costs. At best, the mention of the appeals in the citations represents admirable attention to the Bluebook by the Commission.

¶ 55     Since ratemaking is a legislative function and traditional principles of stare decisis do not apply, it was permissible for the Commission to allow a different recovery method in this case than in the Duke cases. However, when departing from the Duke cases, under general tenets of administrative law, the Commission needed to provide some explanation directly addressing why it departed when the Duke cases were similar, recently decided, and brought to the Commission's attention.[5] The Commission's failure to provide that explanation rendered its order arbitrary and capricious.

¶ 56     Further, contrary to the Public Staff's contention, reversing this case for the Commission to correct its erroneous reasoning would not be "futile." According to the

Second, the Commission provided "a summary of the evidence that is in the record," which included the opposing arguments of the Public Staff and Dominion's witnesses concerning how the Commission should apply the Duke cases. *Id.* at 85–86, 99, 105–06, 114–15, 117. In its analysis, the Commission also referenced some exhibits that appeared in the Duke cases, *id.* at 124 & n.22, 127–29, and recognized that Dominion claimed it was entitled to a return on CCR costs because of the Duke cases, *id.* at 133. However, the order never actually addressed which of the arguments concerning the Duke cases the Commission found persuasive or explained why the Commission chose not to follow the Duke cases. *Id.* at 121–44. Thus, on appeal, this Court can only speculate as to why the Commission declined to follow the Duke cases.

[5] Notably, in each of the 2018 Duke cases, the Commission explicitly discussed the 2016 Dominion case when explaining why it allowed the Duke utilities to recover their CCR costs through a five-year amortization period with a return on the unamortized costs. *See In re Joint Application by Duke Energy Progress, LLC, and Duke Energy Carolinas, LLC, for Accounting Order to Defer Environmental Compliance Costs*, Docket No. E-2, Sub 1103, 2018 N.C. PUC LEXIS 105, at *499–501 (N.C.U.C. Feb. 23, 2018); *In the Matter of Joint Application by Duke Energy Progress, LLC, and Duke Energy Carolinas, LLC, for Accounting Order to Defer Environmental Compliance Costs*, Docket No. E-7, SUB 1110, 2018 WL 3209374, at *264 (N.C.U.C. June 22, 2018).

Public Staff, since *Stein* reversed the two Duke cases, "there is now no need for the Commission to distinguish the ratemaking treatment that it afforded Duke that was later reversed and superseded." However, this argument only highlights the problem with the Commission's decision in this case. Without an explanation from the Commission, this Court has no basis for knowing why the Commission chose not to follow the Duke cases. Thus, this Court can only speculate as to what effect *Stein* would have on the Commission's reasoning in this case.

More importantly, at the time the Commission decided this case, *Stein* had not yet been decided by this Court. Thus, the Commission must have chosen to depart from the Duke cases for some reason other than *Stein*. Accordingly, the partial reversal of the Duke cases in *Stein* and their ultimate settlement does not provide this Court with any further insight as to why the Commission chose not to follow them or permit us to conclude that its decision to depart from the Duke cases was not arbitrary and capricious.

Ultimately, the lack of an explanation by the Commission is the fatal flaw in this case. While nonarbitrary explanations for why the Commission treated one utility differently than another utility certainly could exist,[6] so could arbitrary ones.

---

[6] For instance, the majority notes that the Duke utilities were assessed substantial mismanagement penalties in the 2018 cases while Dominion incurred no such penalty in this case. Again, however, this Court has no way to determine whether the mismanagement penalty was a factor in the Commission's decision to depart from the Duke cases. After all, the substantial mismanagement penalty referenced by the majority escaped the attention of

For instance, the Commission might arbitrarily treat out-of-state-based utilities differently than locally based ones due to a bias towards local businesses. Unless the Commission had to directly explain why it treated two similarly situated utilities differently, it could hide biased, arbitrary decision-making through the release of reasonable but unrelated explanations in each case. The risk that some businesses will be treated differently than others, without a guarantee that they will receive an explanation as to why they are treated differently, will only undermine trust in our government and prevent us from reviewing the Commission's decisions to ensure they are not arbitrary and capricious. *See, e.g.*, *State ex rel. Utilities Comm'n v. Stein*, 375 N.C. 870 (2020) (Newby, J., concurring in part and dissenting in part); *In re Harris Teeter, LLC*, 378 N.C. 108, 2021-NCSC-80 (Berger, J., dissenting); *id.* (Barringer, J., dissenting). General tenets of administrative law would not permit such a situation, but apparently, the majority is willing to adopt a different standard, a standard that will now govern all utilities who wish to conduct business in North Carolina.

### III.    Conclusion

An agency's decision is arbitrary and capricious if it does not explain why it decided to depart from two cases decided less than two years prior that featured materially similar facts and were brought to its attention. The majority's decision to

---

the Public Staff who, on appeal, did not suggest it as a possible reason for distinguishing the Duke cases from the present case.

the contrary now permits the Commission to treat two similarly situated entities differently without ever having to directly address the reason for the disparate treatment. The majority's decision on this point contradicts general tenets of administrative law. Because this case should be remanded to the Commission to address the issue discussed herein, I respectfully dissent.

Chief Justice NEWBY and Justice BERGER join in this dissenting opinion.